UNITED STATES DISTRICT COURT
DISTRICT OF CONNECTICUT

```
LAURA PIAO                        :
                                  :
                                  :
v.                                :   CIV. NO. 3:11CV1853 (HBF)
                                  :
WILLIAM SMITH,                    :
JENNINGS SMITH                    :
INVESTIGATIONS, INC.             :
```

## MEMORANDUM OF DECISION

Plaintiff Laura Piao brought this diversity action against defendants William Smith and Jennings Smith Investigations, Inc. ("JSI;" William Smith and JSI are collectively referred to as "defendants"), for breach of contract, breach of the implied covenant of good faith and fair dealing, violation of the Connecticut Unfair Trade Practices Act ("CUTPA"), and negligent infliction of emotional distress. Defendants counterclaimed for breach of contract, libel, and intentional and negligent infliction of emotional distress.[1] A jury trial was held on October 1 and 2, 2014.[2] At the end of evidence, JSI moved to "dismiss" plaintiff's CUTPA claim. [Doc. #95]. The Court, construing the oral motion to dismiss as a motion for judgment as a matter of law pursuant to Rule 50(a) of the Federal Rules of Civil Procedure, granted JSI's motion prior to charging the

---

[1] Prior to the start of evidence, counsel clarified on the record the claims each party would ultimately pursue. Plaintiff limited her claims to breach of contract, breach of the implied covenant of good faith and fair dealing, and violation of CUTPA, all against JSI. JSI limited its counterclaims to breach of contract and libel. William Smith limited his counterclaim to libel.

[2] The jury began deliberations on October 2, 2014, which continued to October 3, 2014.

jury. [Doc. #96].[3] This memorandum of decision memorializes and supplements the Court's ruling announced on the record on October 2, 2014.

## I.   **INTRODUCTION**

On March 13, 2009, plaintiff hired Jennings Smith Investigations, Inc., a private investigations firm owned and operated by William Smith, to perform investigative services related to a single-vehicle car accident in which plaintiff's daughter, Connie Chen, was seriously injured. The parties' contractual relationship eventually deteriorated, leading to this litigation.

Plaintiff alleged that JSI's conduct, by and through the actions of Mr. Smith, was deceptive, and therefore violated CUTPA. Specifically, plaintiff alleged the following "deceptive" conduct: (1) Mr. Smith induced plaintiff to engage JSI with promises that defendants would engage the services of an expert FBI agent, despite knowing that no such agent would or could offer assistance in their investigation; (2) Mr. Smith induced plaintiff to believe that JSI was a national investigative agency with clients throughout the country, capable of handling the most complex of investigations; (3) Mr. Smith promised plaintiff that the investigative work would be privileged and not communicated to a third party without plaintiff's consent; (4) Mr. Smith created false billing invoices and a back-dated report in an effort to avoid paying a refund for unearned fees

---

[3] The Jury found against JSI and William Smith on all of the counterclaims, and found in plaintiff's favor on her breach of the implied covenant of good faith and fair dealing claim. The Jury awarded plaintiff damages of $8,250.00. [Doc. #98].

and in support of JSI's claims for additional fees; (5) Mr. Smith falsely created billing records and altered written records to bolster claims for unearned fees; and (6) Mr. Smith represented JSI's services were superior and sophisticated to induce plaintiff to pay fees in excess of those that are reasonable and customary in the community. Plaintiff further alleged that JSI's billing practices, as described above, constituted an unfair trade practice because these practices are "immoral, unethical, oppressive or unscrupulous." She also claimed that JSI's alleged breach of contract violated CUTPA.

Two essential elements of plaintiff's CUTPA claim are that JSI engaged in unfair or deceptive acts or practices and that this conduct caused plaintiff to sustain an "ascertainable loss." Because, in the Court's view, no reasonable juror could find from the evidence at trial that JSI's alleged conduct was either an unfair or deceptive act or practice and/or that such conduct caused plaintiff to sustain an "ascertainable loss," the Court declined to submit plaintiff's CUTPA claim to the jury, and granted judgment as a matter of law on this claim.

## II.  **RULE 50(A)**

The court "will grant a motion for judgment as a matter of law only if, viewing the evidence in the light most favorable to the non-moving party, a reasonable juror would be compelled to find in favor of the moving party." Drew v. Connolly, 536 F. App'x 164, 165 (2d Cir. 2013) (citation and internal quotation marks omitted). "When evaluating a motion under Rule 50, courts are required to 'consider the evidence in the light most

favorable to the party against whom the motion was made and to give that party the benefit of all reasonable inferences that the jury might have drawn in its favor from the evidence.'" <u>ING Global v. United Parcel Serv. Oasis Supply Corp.</u>, 757 F.3d 92, 97 (2d Cir. 2014) (quoting <u>Tolbert v. Queens Coll.</u>, 242 F.3d 58, 70 (2d Cir. 2001)). "The Court cannot assess the weight of conflicting evidence, pass on the credibility of the witnesses, or substitute its judgment for that of the jury, and must disregard all evidence favorable to the moving party that the jury is not required to believe." <u>Id.</u> (internal quotation marks omitted).

### III. **RELEVANT FACTUAL BACKGROUND**

Bearing in mind the Rule 50(a) standard articulated above, the following comprises the relevant evidence at trial.

#### 1. **Connie Chen's Car Accident & Bluevision Report**

In March of 2008, plaintiff's daughter, Connie Chen, was a junior at the Hopkins School ("Hopkins") in New Haven, Connecticut. Hopkins is a co-educational college preparatory day school that has provided educational services since 1660. Hopkins offers a variety of athletic programs, including girls swimming. Ms. Chen was an accomplished swimmer at Hopkins. However, in 2007 and 2008, plaintiff began to develop concerns as to Ms. Chen's opportunities at Hopkins as well as about the swim coach, Chuck Elrick's, treatment of Ms. Chen. On November 6, 2008, plaintiff attended a meeting with the Hopkins athletic director and Coach Elrick to discuss these concerns. Later that same day, Ms. Chen was seriously injured in a single car

4

accident just a short distance from Hopkins. The New Haven Police Department cited Ms. Chen for traveling too fast for road conditions. [Pl. Ex. 1].

Plaintiff later developed concerns that Ms. Chen's car accident was the result of a malicious act, specifically that Ms. Chen's tire had been slashed. As a result, plaintiff hired Bluevision Investigations, LLC ("Bluevision") to investigate the circumstances of the car accident. In a report dated November 17, 2008 ("Bluevision Report"), case manager Patrick Troy concluded in pertinent part that, "[d]amage to front passenger tire sidewall resulted from accident related forces and wheel movement causing the outer edge of the front passenger rim to cut into the tire sidewall." [Def. Ex. 505]. Following her receipt of the report, plaintiff met with New Haven Police Officer Steven Manware,[4] who advised that the damage to Ms. Chen's tire was not, in his opinion, a "rim cut," as Mr. Troy concluded. Following this conversation, plaintiff decided to enlist the assistance of a private investigator. She then contacted Jennings Smith Investigations, Inc.

## 2. **Jennings Smith Investigations, Inc. and Formation of the Contract**

Jennings Smith Investigations, Inc. is a private investigation firm, whose sole member and employee is William Smith.[5] Mr. Smith became a licensed investigator in 1977 and

---

[4] Officer Manware authored the New Haven Police Report about Ms. Chen's accident. [Pl. Ex. 1].

[5] JSI operates out of an office located in Mr. Smith's home in Canton, Connecticut.

since that time has performed work for several national insurance companies, Fortune 500 companies, law firms, the State of Connecticut, and various municipalities. JSI advertises its services on the internet, including private investigations, background investigations, litigation support, risk management, and security consulting. [Pl. Ex. 15]. JSI has also provided services out of state.

JSI lists its "management" on the JSI website as: William Smith, president and licensee; Ralph A. DiFonzo, Jr., director, special investigation services; John H. Dewey, senior investigator, corporate investigations; Daniel J. Sivori, special investigator, operations manager; Charles J. Walsh, special consultant; Bo Mitchell, director, security risk management services; Ed Kardauskas, senior security consultant; and John R. Griffin, special consultant. [Pl. Ex. 15]. The website also includes a brief biography for each of these individuals, which details his professional accomplishments and/or role at JSI. For example, Mr. DiFonzo is noted as a "nationally known expert in criminal investigation and retired Special Agent of the FBI," who "has been featured on numerous television and radio programs for his extensive knowledge of profiling fugitives and criminal investigations." [Id.]. Mr. Sivori is noted as "[a]n experienced and exceptionally qualified Investigator and Security Consultant," who as JSI's "Special Investigator and Operations Manager, [] conducts and supervises investigations for Corporate, Legal, and individual clients." [Id.]. The members of JSI's management team are

consultants/independent contractors who are registered with the Connecticut State Police as agents of JSI; they are not JSI's employees.

Plaintiff searched the internet for a private investigator and considered each resulting company's services, staff, and training. Ms. Piao was impressed by JSI's website and the detailed information it provided as to its management team's abilities. Based on JSI's website, plaintiff believed that JSI was an agency managed by eight people in light of the names and titles of each team member listed. She also believed that JSI was a large national company, comparable to Coca Cola or FedEx.

After reviewing JSI's website, in mid-December 2009, plaintiff contacted JSI and spoke to Mr. Smith via telephone. She explained the circumstances of her daughter's car accident and her belief that vandalism caused the accident. She asked Mr. Smith whether JSI could determine the cause of Ms. Chen's accident. Mr. Smith responded that JSI was not an expert in accident reconstruction and suggested that plaintiff hire an accident reconstructionist. At plaintiff's request, Mr. Smith referred her to Peter Plante, a traffic accident reconstructionist with whom Mr. Smith had previously worked. Plaintiff did not advise Mr. Smith of the results of the Bluevision Report at this time or at any time during JSI's investigation.

Plaintiff retained Mr. Plante, who prepared a "Preliminary Accident Reconstruction Report" dated March 4, 2009. [Pl. Ex. 2]. This report concluded, in pertinent part, that, "The [tire]

cut occurred pre-collision and was not the result of the
collision process. While the exact instrument utilized to cause
the cut is unknown, the cut is consistent with having been
produced by a knife or a similarly sharp and pointed object."
[Id.]. After receiving the results of Mr. Plante's report,
plaintiff contacted Mr. Smith to discuss retaining JSI for
further investigation. Thereafter, on March 13, 2009, plaintiff,
her husband, and JSI entered into a contract for services to
investigate Ms. Chen's car accident. [Def. Ex. 506]. Plaintiff
signed the contract in light of the information offered on JSI's
website and Mr. Smith's representations concerning Mr. DiFonzo's
anticipated work on the case.[6] Although plaintiff requested that
she sign the contract at JSI's offices, the contract was
executed via facsimile.

The contract for services sets forth the following
pertinent terms:

> **IN CONSIDERATION THEREFORE** the client agrees to
> immediately pay JSI a retainer in the amount of
> $5300.00. Retainers are paid in advance and reflect
> the estimated minimum case fee for work to be
> performed. **The fee** shall be charged at the hourly rate
> of $150.00 per hour. All services will be billed at
> the hourly rates set forth above, on a basis of tenths
> of an hour, **with two tenths of an hour (.20) being the
> minimum billed for any activity** […]

> JSI will not initiate an investigation without a
> retainer. Fees shall be charged against the initial
> retainer, however the client will be notified prior to
> the additional work being performed and all work will
> stop until the retainer is refreshed. If the client
> either orally or in writing authorizes additional work
> to be performed that involves billing over the minimum
> retainer, client agrees to immediately pay that amount

---

[6] JSI would not have taken plaintiff's case without the results of Mr.
Plante's investigation.

upon being notified by JSI either orally or in writing. **Retainers are non refundable.**

**[…]**

**PROMISES AND GUARANTEES** Client understands and hereby acknowledges that no promises or guarantees have been expressed orally or in writing by JSI relating to the outcome of this assignment[…]

[Def. Ex. 506] (emphasis in original). Ms. Piao tendered JSI a $5,300 retainer pursuant to the terms of the contract. [Pl. Ex. 5]. Over the course of JSI's investigation, Plaintiff paid an additional $8,250, for a total paid of $13,550. [Pl. Ex. 5]. Following the execution of the contract, Mr. Smith began investigating Ms. Chen's accident.

### 3. Events Following Entry of Contract – 2009

On April 2, 2009, plaintiff attended a meeting with the headmaster of Hopkins to discuss her concerns about several universities rejecting Ms. Chen's applications. An attorney for Hopkins, Jacqueline DeAndrus Bocar, also attended this meeting and implied that if plaintiff continued to make allegations harmful to Hopkins's reputation, that the school would take legal action. [See Def. Ex. 501; Def. Ex. 502, tab 4]. Following this meeting, plaintiff requested Mr. Smith's assistance in locating an attorney to represent her. [See Def. Ex. 501; Def. Ex. 502, tab 4]. Eventually, Mr. Smith introduced plaintiff and her family to Attorney John Bonee. [See Def. Ex. 501]. Plaintiff and her husband retained Attorney Bonee following a meeting at his office on April 22, 2009. [See Def. Ex. 501; Def. Ex. 502, tab 4]. Mr. Smith also attended this meeting. [Id.]. During this initial meeting, Attorney Bonee instructed plaintiff and her

husband that Mr. Smith would report all findings of his
investigation to Attorney Bonee so that any work product
obtained would be privileged, in light of the attorney's
concerns for potential litigation by Hopkins. [Def. Ex. #501].
Attorney Bonee also instructed Mr. Smith not to prepare a
written report of the investigation because of litigation
concerns.

Over the next several months, Mr. Smith began investigating
the circumstances of Ms. Chen's car accident. His investigation
included reviewing the New Haven Police Department reports,
speaking to the New Haven Police Department for purposes of re-
opening the investigation into Ms. Chen's accident, inspecting
the accident scene and the Hopkins campus, and interviewing a
former Hopkins student, who was also member of the swim team.
[See Def. Ex. 501]. Plaintiff also requested Mr. Smith to
examine checks she tendered to Coach Elrick for the swim team.
[See id. at tabs 41-42]. During the course of the investigation,
Mr. Smith did not provide plaintiff with any written reports of
his work, or any billing statements. Mr. Smith did, however,
maintain verbal communication with plaintiff and her attorney
during the course of his investigation. [See Pl. Ex. 11]. Mr.
Smith also frequently communicated with plaintiff via email.
[See generally Def. Ex 502].

In July 2009, the tire in question was sent for examination
to Gary Bolden, the director of forensic services, Standards
Testing Labs, located in Ohio. [Def. Ex. 501; Def. Ex. 502, tab
7]. After examining the tire, Mr. Bolden concluded that the

damage to the tire was impact related, and not from an intentional act of vandalism. [See Def. Ex. 501; Def. Ex. 502, tab 8]. Following the receipt of Mr. Bolden's opinion regarding the cause of the tire damage, on September 17, 2009, plaintiff and her husband attended a meeting with Attorney Bonee and Mr. Smith. [See Def. Ex. 501; Def. Ex. 502, tab 8]. During the meeting, the results of Mr. Bolden's examination were discussed. In light of Mr. Bolden's opinions, Attorney Bonne advised Mr. Smith not to write a report of his investigation. [See id.]. At this meeting, Attorney Bonee advised plaintiff and her husband that in light of this information, he could no longer assist their attempts to reopen the New Haven Police Department's investigation into Ms. Chen's car accident.

In November 2009, at plaintiff's request, Mr. Smith provided her with a copy of a witness interview statement from an interview of a former Hokpins student conducted in June 2009. [Doc. #502, tab 10]. The email transmitting the interview statement states, "This document is subject to the Attorney Work Product doctrine as Attorney Bonee directed me to interview the witness to assist him with Connie's case. Please check with him before you disseminate this Interview Statement with anyone." [Id.].

### 4. Events Following Entry of Contract – 2010

Mr. Smith did not hear from plaintiff again until March 4, 2010, when she requested an itemized bill of his services rendered to date. [See id. at tab 11]. Throughout the month of March 2010 and the beginning of April 2010, plaintiff and Mr.

11

Smith corresponded via email concerning JSI's final bill. [See id. at tabs 11-12].[7] Email communications reflect that Mr. Smith did not provide the bill in March or April 2010 due to his intervening health issues and other investigational commitments. [Id.]. Mr. Smith eventually provided plaintiff the final bill for services on May 18, 2010. [Def. Ex. 503; Pl. Exs. 5-6]. The initial bill tendered failed to reflect a credit for one payment previously made. [Pl. Ex. 6]. This was rectified on a revised bill. [Pl. Ex. 5; Def. Ex. 502, tab 13]. In addition to the invoices, Mr. Smith also kept a running list of outgoing telephone calls made on the case. [See Pl. Ex. 9]. This list reflects the date and time of the call, as well as the "phone minutes" and "billable minutes" for each call made. [Id.]. Calls that only lasted one phone minute were billed at twelve minutes pursuant to the terms of the contract. [Id.; see also Def. Ex. 506]. Several of the billable minute entries do not comport with phone minutes. For example, a call that lasted sixteen minutes was billed at twenty four minutes, versus eighteen minutes, and calls lasting only thirteen minutes were billed at twenty four minutes, versus eighteen minutes. [Pl. Ex. 9; see also Def. Ex. 503 (reflecting billed minutes for these and other calls)]. Mr. Smith admitted he made mistakes in his billing, but never offered a refund for such mistakes.

Plaintiff first requested a copy of JSI's investigation report in April 2010 when her new attorney, William Gallagher,

---

[7] Emails reflect that over the course of these communications, Mr. Smith learned that plaintiff had terminated Attorney Bonee's services.

sent Mr. Smith a letter dated April 9, 2010, demanding a copy of the report. [Def. Ex. 502, tab 12]. In late August 2010, Mr. Smith contacted plaintiff and her husband for payment outstanding under the May 18, 2010 invoice. [Id. at tab 13]. In response, plaintiff and her husband renewed their demand for a written investigation report. [See Def. Ex. 502, tab 13]. In response to this request, Mr. Smith advised that he "did not provide a formal report to you directly as requested by Atty. Bonee to insure compliance with the Attorney Work Product Doctrine. I will be contacting your new Attorney Paul Spinella and will as[k] him to provide me with a letter of representation and thereafter provide him with a report of investigation in the near future." [Id.]. Subsequent correspondence from Mr. Smith to plaintiff reiterates his concern that a written report issued directly to plaintiff might render it vulnerable to disclosure in potential future litigation. [See id.]. Plaintiff demanded that she receive the written report by September 11, 2010. [Id.]. When plaintiff did not receive the report by this date, she emailed Mr. Smith, inquiring of the method by which he sent the report. [Id.].

In response to this email, Mr. Smith emailed Attorney Bonee with a copy to plaintiff, her husband, and Attorney Spinella wherein he requested Attorney Bonee to, "inform and confirm the fact that you instructed me not to write a report of investigation on this case in part because of the information that I received from Ohio[…]" [Id.] (emphasis in original). Mr. Smith also expressed his concern that, "the preparation of a

written report would adversely effect (sic) Laura and Ping's ability to seek judicial relief." [Id.]. Plaintiff responded to this email and provided a "last deadline" of September 16, 2010 for Mr. Smith to deliver a written report of his investigation. [Id.]. On September 15, 2010, Mr. Smith advised plaintiff that he was in the process of writing his final investigation report, which he intended to deliver to Attorney Bonee, for delivery to plaintiff, no later than September 22, 2010. [Def. Ex. 502, tab 13]. When plaintiff did not receive Mr. Smith's written report on September 16, she  sent him a letter dated September 17, 2010 stating that she would not accept "any verbal or written reports from [JSI] after the deadline – September 16, 2010[…]" [Id.]. In this letter, plaintiff demanded a refund of the majority of the payments she had made for JSI's services. [Id.].

Mr. Smith eventually prepared a final report of investigation, consisting of a sixteen page chronological report, and 43 tabbed exhibits. [Def. Ex. 501]. Mr. Smith attempted to deliver the report to Plaintiff via FedEx on September 24, 2010.[8] [Def. Ex. 502, tab 13]. Plaintiff, however, refused to accept the package and again demanded a refund of her payment. [Id.]. Plaintiff ultimately received a copy of JSI's written report in March 2011, when the same was delivered to her then attorney. [Pl. Ex. 14]. The report was delivered in an effort to resolve plaintiff's complaint filed with the Better Business Bureau against JSI. [Id.].

---

[8] Also included was an invoice dated September 22, 2010 seeking payment for activities associated with preparing the final report of investigation. [See Def. Ex. 503].

IV.   **DISCUSSION**

    1. **Elements of a CUTPA claim**

       The CUTPA statute prohibits any person from engaging in "unfair methods of competition and unfair or deceptive acts or practices in the conduct of any trade or commerce." Conn. Gen. Stat. §42-110b(a). "To prevail on a CUTPA claim, the plaintiffs must prove that (1) the defendant engaged in unfair or deceptive acts or practices in the conduct of any trade or commerce[9]; and (2) [he or she] has suffered an ascertainable loss of money or property as a result of the defendant's acts or practices." Artie's Auto Body, Inc. v. Hartford Fire Ins. Co., 287 Conn. 208, 217-18 (2008) (citations omitted; brackets in original).

       *a. Unfair or Deceptive Acts*

       "In order to establish CUTPA liability based on the unfair acts prong, a 'claimant's evidence must establish that the conduct at issue falls within one of three criteria. A court must decide whether the conduct (1) offends public policy, (2) is immoral, unethical, oppressive or unscrupulous or (3) causes substantial injury to consumers, competitors or other businessman.'" Genworth Fin. Wealth Mgmt., Inc. v. McMullan, No. 3:09CV1521(JCH), 2012 WL 1078011, at *11 (D. Conn. Mar. 30, 2012) (quoting Johnson Elec. Co v. Salce Contracting Assocs., 72 Conn. App. 342, 356 (2002)). "All three criteria do not need to

---

[9] "'Trade' and 'commerce' means the advertising, the sale [], the offering for sale [], or the distribution of any services and any property, tangible or intangible, real, personal or mixed, and any other article, commodity, or thing of value in this state." Conn. Gen. Stat. §42-110a(4). Because this element of plaintiff's CUTPA claim was not raised during argument on JSI's motion for judgment as a matter of law, nor does it appear disputed, the Court will not address this element in its analysis below.

be satisfied to support a finding or unfairness. A practice may be unfair because of the degrees to which it meets one of the criteria or because to a lesser extent it meets all three." Ramirez c. Health Net of Northeast, Inc., 285 Conn. 1, 19 (2006) (citations omitted). As to the third criteria pertaining to substantial injury, plaintiff must also prove that defendant's conduct caused an injury that is substantial, that is not outweighed by countervailing benefits to consumers or competition, and that injury to consumers or competitors could not have been reasonably avoided. McLaughlin Ford, Inc. v. Ford Motor Co., 192 Conn. 558, 569-70 (1984).

"For purposes of CUTPA, an act or practice is 'deceptive' if (1) defendant[] made a material representation, omission, or other practice likely to mislead consumers and (2) consumers interpreted the message reasonably under the circumstances, and (3) the misleading representation, omission, or practice was material – that is, likely to affect consumer decisions or conduct." Encompass Advisors, Ltd. v. Unapen, Inc., No. 3:09CV1949(DFM), 2014 WL 208578, at *2 n. 4 (D. Conn. May 19, 2014)(citing Genworth Fin., 2012 WL 1078011, at *12).

### b. Ascertainable Loss

A loss is a deprivation, detriment, or injury. Hinchcliffe v. American Motors Corp., 184 Conn. 607, 613 (1981). It is ascertainable if it is capable of being discovered, observed, or established. See id. (citation omitted).  In addition to proving that a defendant engaged in unfair or deceptive acts or practices in the conduct of its trade or commerce, a plaintiff

16

must also prove that he or she suffered an "ascertainable loss" as a result of the alleged CUTPA violation. See Abrahams v. Young and Rubicam, Inc., 240 Conn. 300, 307 (1997) (emphasis in original) ("[T]o prevail in a CUTPA action, a plaintiff must establish both that the defendant has engaged in a prohibited act and that, 'as a result of' this act, plaintiff suffered an injury. The language 'as a result of' requires a showing that the prohibited act was the proximate cause of harm to the plaintiff."). If plaintiff's damages would have occurred regardless of the CUTPA violation, then the violation was not an actual cause of the party's damages. See Eamiello v. Liberty Mobile Home Sales, Inc., 208 Conn. 620, 654-55 (1988) (reversing decision below finding CUTPA violation in part because there was no indication that plaintiffs sustained any damages attributable solely to the claimed CUTPA violation or that their damages were increased by that conduct); Haesche v. Kissner, 229 Conn. 213, 223-24 (1994) (finding plaintiff could not establish CUTPA violation for failure to warn where plaintiff failed to show that he suffered harm as a result of the alleged violation); see also Conaway v. Prestia, 191 Conn. 484, 495 (1983) (CUTPA plaintiff must prove that the damages claimed were "occasioned by the defendant's wrongful conduct.").

## 2. **Specific Allegations of Unfair or Deceptive Conduct**

### a. *Website/Offering Services of FBI Agent*

Plaintiff claims that JSI's conduct was deceptive by virtue of certain false information offered by JSI's website and Mr. Smith, which plaintiff claims induced her to engage the services

of JSI. Specifically, plaintiff claims the following conduct was deceptive: (1) that JSI's website would lead a reasonable person to believe that it had a management team consisting of an impressive set of employees, when at most these individuals were independent contractors; (2) that Mr. Smith induced plaintiff to engage JSI's services with promises that JSI would engage the services of an expert FBI agent, namely Mr. Difonzo, knowing no such agent would or could offer these services; and (3) relatedly, that plaintiff would not have engaged JSI but for its website and Mr. Smith's representations that Mr. DiFonzo would work on the case. The Court will address each of these allegations in turn.

### (i)   Website

As to JSI's website, plaintiff argues that she would not have hired JSI "but for" the website. Plaintiff argued that JSI's website would lead a reasonable person to believe that when he or she was engaging JSI, it consisted of a management team consisting of an impressive set of employees, when in fact, most of the individuals listed on the website are nothing more than independent contractors. Expanding on this, plaintiff argued that one of the individuals listed on the website is noted as an "operations manager," when in fact there are no operations to manage.

Turning first to the contents of the website, the trial evidence does not support a finding by a reasonable juror that the website was likely to mislead consumers.  The website does not state that members of the management team are "employees,"

18

nor does the trial evidence support a finding that anything
stated on the website was false or deceptive. [Pl. Ex. 15].
Indeed, the majority of the team members (four out of seven) are
specifically listed as "consultants," including Mr. Sivori, the
"Operations Manager", who is explicitly noted as an
"Investigator and Security Consultant." [Pl. Ex. 15 (emphasis
added)].[10] Nor does the trial evidence support a reasonable juror
finding that the members of the management team are fictional,
or their services were not at JSI's disposal. For example, Mr.
Smith testified that the management team members are consultants
who are registered with the State of Connecticut as authorized
to act as JSI's agents on assignment. He also testified that he
has worked with several of these team members, as well as
consults with them to discuss work opportunities and training.
Plaintiff offered no evidence to the contrary. Accordingly, the
trial evidences would not support a reasonable juror finding
that JSI's website was deceptive.

Next, plaintiff argues that Mr. Sivori's "Operations
Manager" title is deceptive because there are no operations to
manage. This is not a reasonable interpretation of Mr. Sivori's
title under the circumstances. Indeed, the paragraph explaining
Mr. Sivori's qualifications states, "An experienced and
exceptionally qualified Investigator and Security Consultant […]
As our Firm's Special Investigator and Operations Manager, Dan
conducts and supervises investigations for Corporate, Legal and

---

[10] It is worth noting that plaintiff testified that she "knows" what a
consultant "means."

individual clients[…]" [Pl. Ex. 15]. In the context of this paragraph, the trial evidence would compel a reasonable juror to find that Mr. Sivori, as the "operations manager," manages the operations described in that paragraph, should they be undertaken. The trial evidence would not support a finding that plaintiff interpreted Mr. Sivori's title reasonably under the circumstances, or a finding that JSI's website was deceptive.

### (ii) Services of FBI Agent

Plaintiff also argues that Mr. Smith induced her to engage the services of JSI by promising that JSI would use the services of an expert FBI agent, namely Mr. Difonzo, while knowing no such agent would or could offer these services. Plaintiff further submits that, in addition to JSI's website, she would not have engaged JSI "but for" the representation that the investigation would be handled in substantial part by Mr. DiFonzo.

First, the trial evidence would support a reasonable juror's concluding that an expert FBI agent, including Mr. DiFonzo, could offer his expert services to JSI. Even drawing inferences in favor of plaintiff, the trial evidence supports a conclusion that JSI had at its disposal the services of "expert FBI agents", including those of Mr. DiFonzo. Indeed, Mr. Smith testified that members of the JSI management team, See Pl. Ex. 15, including Mr. DiFonzo and John Dewey, have worked with JSI on certain audits and assessments. Mr. Smith also testified that he consults with members of the management team to discuss work opportunities and training. Plaintiff has not presented any

evidence to contradict this, nor has plaintiff presented any evidence that the members of the management team are fictional or that their credentials have been exaggerated or falsified. Quite simply, the trial evidence would not support a conclusion by a reasonable juror that no expert FBI agent could or would offer his services to JSI.

Turning to the allegation that Mr. Smith induced plaintiff to enter into the contract with the representation that Mr. DiFonzo would handle the investigation into Ms. Chen's car accident, the Court finds that the trial evidence would not support a reasonable juror's conclusion that this conduct violated CUTPA. Plaintiff has offered no evidence that she incurred any injury as a result of this particular statement, assuming it was made, or that she would have acted differently had this statement not been made. Indeed, the trial evidence estabishes that plaintiff hired JSI primarily based on the information offered on JSI's website. See, e.g., Consolidated Marketing Corp. v. Carol Cable Co., Civ. No. H 81-262(JAC), 1985 WL 5956, at *2 (D. Conn. Nov. 20, 1985) (finding alleged misrepresentation caused company no "ascertainable loss" where plaintiff "offered no evidence that it incurred any injury as a result of the alleged statements or that it would have acted differently with respect to [defendant] had the statements not been made."). Indeed, it was because of JSI's website that plaintiff contacted Mr. Smith in the first instance. Moreover, during the course of the investigation, plaintiff never inquired regarding Mr. Difonzo's involvement and often thanked and

praised Mr. Smith's work. <u>See, e.g.</u> Def. Ex. 501 at tab 11
(Email from plaintiff's husband to Mr. Smith stating, "Thank you
for all you have done for our family."); Def. Ex. 502 at tab 4
(Email from plaintiff to Mr. Smith stating, "I really hope that
there are more people like you in this world. Thank you very
much for all your help."); <u>id.</u> at tab 5 (Email from plaintiff to
Mr. Smith again stating, "Thank you for all your help."); <u>id.</u> at
tab 10 (Email from plaintiff's husband to Mr. Smith stating, "I
can feel the effort you made to get the fact. I really
appreciate the good job you have done for our family. Another
important information you mentioned before about Chuck Elrick's
financial fraud is also requested if you have completed the
report. I have no doubt you will be famous on this case. Thanks
again."). This further suggests that plaintiff did not suffer an
ascertainable loss caused by a representation that Mr. DiFonzo
would work on the case.

### b. *Promises of Confidentiality*

Plaintiff next contends that JSI's conduct was deceptive
because Mr. Smith promised that JSI's investigative work would
not be communicated to third parties without plaintiff's
consent. Again, the trial evidence would not provide a
reasonable juror with any basis to conclude that this described
conduct violated CUTPA. As an initial matter, the contract
between JSI and plaintiff makes no promises of confidentiality,
nor has any evidence been introduced as to the existence of a
separate confidentiality agreement. Evidence at trial also
established that Mr. Smith communicated with officers at the New

Haven Police Department for purposes of reopening the investigation into Ms. Chen's accident. Even viewing the evidence in the light most favorable to plaintiff, it supports a conclusion that plaintiff personally gave permission for Mr. Smith to contact the New Haven Police Department to "report a crime," i.e., Ms. Chen's car accident. The evidence further supports a finding that plaintiff, by and through Attorney Bonee, provided Mr. Smith with permission to speak to the New Haven Police Department for purposes of reopening the investigation into Ms. Chen's accident. See also, e.g., Def. Ex. 501; Def. Ex. 501 at tabs 9-10, 36; Def. Ex. 502 at tabs 4, 7.

Moreover, the trial evidence would not provide a reasonable juror with any basis to conclude that plaintiff suffered an ascertainable loss as a result of this conduct. "Although the ascertainable loss requirement does not require a precise dollar and cents figure, it does require a deprivation, detriment or injury that is capable of being discovered, observed or established." Larobina v. Wells Fargo Bank, N.A., No. 3:10-cv-01297(MPS), 2014 WL 341953, at *1 (D. Conn. July 10, 2014) (internal citations and quotations omitted). Indeed, there is no evidence in the record that plaintiff suffered a deprivation, detriment, or injury as a result of Mr. Smith's communications with the New Haven Police Department about Ms. Chen's accident. Accordingly, the evidence did not provide a basis from which a reasonable juror could find the ascertainable loss required to prevail under a CUTPA claim arising from Mr. Smith's communications with the New Haven Police Department. See, e.g.,

Marinos v. Poirot, 308 Conn. 706, 714 (2013) ("[A] plaintiff []
must marshal some evidence of ascertainable loss in support of
her CUTPA allegations, and a failure to do so is indeed fatal to
a CUTPA claim on summary judgment."). Finally, even if Mr.
Smith's speaking to the New Haven Police Department caused any
harm, such harm would have been to Ms. Chen, a non-party. Harm
to non-parties cannot satisfy the "ascertainable loss"
requirement of Connecticut general statutes § 42-110g(a) in
order to give standing to a party to assert a CUTPA claim. Cadle
Co. v. D'Addario, 131 Conn. App. 223 (2011).

### c. False Billing Invoices & Back-Dated Report

Plaintiff next alleges that JSI's conduct was "deceptive"
and "immoral, unethical, oppressive or unscrupulous" when (i)
Mr. Smith, on behalf of JSI, created false billing invoices and
a back-dated report in an effort to avoid paying a refund for
unearned fees and in support of JSI's claims for additional fees
and (ii) Mr. Smith, on behalf of JSI, created billing records
and altered written reports to bolster claims for unearned fees.
At the close of evidence, plaintiff's counsel further submitted
that evidence supporting plaintiff's claims in this regard
included Mr. Smith's testimony about his practice of rounding
up, including his excessive rounding up for telephone calls.
Again, the trial evidence would not support a finding by a
reasonable juror that these alleged acts violated CUTPA.

First, the trial evidence does not support the claim that
Mr. Smith created false billing invoices and a back-dated report
to avoid paying a refund and in support of JSI's claim for

additional fees. Even considering the evidence in the light most
favorable to plaintiff, a reasonable juror would conclude that
Mr. Smith did not contemporaneously create billing records or a
written report at the instruction of plaintiff's attorney John
Bonee to prevent such records from being disclosed in potential
litigation. Aside from testimony and documentary exhibits which
support this conclusion, the contract between the parties does
not require that JSI provide plaintiff with either written
billing invoices or a written report. Likewise, the trial
evidence would not support a finding by a reasonable juror that
Mr. Smith, on behalf of JSI, created billing records and altered
written reports to bolster claims for unearned fees. The trial
evidence does support a finding that these documents were
created at plaintiff's request and not for a deceptive or unfair
purpose. Moreover, even if Mr. Smith did create these documents
for such unsavory purposes, plaintiff has failed to provide any
evidence of ascertainable loss as a result of this conduct.
Indeed, the contract between the parties explicitly states that
retainers are non-refundable. Nor did plaintiff present any
evidence that she ever tendered payment for JSI's claimed
additional fees.

     To the extent plaintiff alleges that Mr. Smith created
false billing invoices, plaintiff's counsel further elaborated
at trial that Mr. Smith's practices of "excessively" rounding up
his billing for phone calls and failure to credit plaintiff one
retainer payment constitute unfair or deceptive practices. The

trial evidence would not support a reasonable juror coming to this conclusion.

As to the "excessive rounding up" of telephone billing, to the extent that certain calls lasting a minute or less were rounded up and billed at the equivalent of twelve minutes' time (.20), the contract between JSI and plaintiff explicitly permits this. See Def. Ex.506 ("All services will be billed at the hourly rates set forth above, on a basis of tenths of an hour, **with two tenths of an hour (.20) being the minimum billed for any activity**.") (emphasis in original). Plaintiff also elicited testimony from Mr. Smith regarding his billing for outgoing calls. See also Pl. Ex. 9 (outgoing telephone log). In addition to rounding up for the time he spent on outgoing calls, there are several instances where Mr. Smith billed in excess of the nearest tenth of an hour increment for the time he spent on outgoing calls. Id. For example, several calls only lasting thirteen, fourteen, or fifteen minutes were billed at twenty four minutes versus eighteen minutes. Id. Mr. Smith testified that he manually compiles and "audits" the outgoing telephone logs by referring to his telephone bills. He further testified that to the extent there were errors on the telephone log for which he excessively billed plaintiff, these errors were mistakes. Plaintiff has provided no evidence to the contrary. Indeed, out of one hundred and seven (107) outgoing telephone calls made, only eighteen (18) are billed in excess of the telephone minutes recorded. Each is only billed one tenth of an hour (6 minutes) greater than it should have. This resulted in

an extra $270 billed to plaintiff. Compared to the total ultimately paid by plaintiff, $13,550, this is not a "substantial injury." See Web Press Services Corp. v. New London Motors, Inc., 205 Conn. 479, 484 (1987) (finding plaintiff could not "satisfy first test of the 'substantial injury' factor for the plain reason that the consumer injury here is not substantial. Plaintiff sought the refund of $7995 by reason of a defect that had injured the plaintiff to the extent of $300 or 3.7 percent of the cost of the vehicle.").

As to Mr. Smith's failure to credit plaintiff one payment, testimony and documentary evidence establish that this was rectified by Mr. Smith. There are multiple instances where he noted the error and apologized profusely. Moreover, even if this were an unfair or deceptive act, the trial evidence would not support a reasonable juror finding an ascertainable loss where Mr. Smith ultimately did credit plaintiff with the payment made.

Therefore, the trial evidence would not support a reasonable juror concluding that the above-described conduct was a violation of CUTPA.

### d. Nature of JSI's Services

Plaintiff next contends that JSI's conduct was "deceptive" when Mr. Smith represented that JSI's services were superior and sophisticated to induce plaintiff to pay fees in excess of those that are reasonable and customary in the community. As previously stated, for purposes of CUTPA, an act or practice is deceptive if it meets three criteria, including that the "defendant made a material representation, omission, or other

27

practice likely to mislead consumers." <u>Encompass Advisors</u>, 2014
WL 208578, at *2 n. 4.

As an initial matter, the trial evidence does not provide a
reasonable juror with any basis to conclude what constitutes a
"reasonable and customary" fee for a private investigator in the
New Haven community.[11]  Nor does the trial evidence provide a
reasonable juror with any basis to conclude that such conduct
was deceptive. A reasonable understanding of the evidence
supports a finding that JSI worked for sophisticated clients and
performed various investigative services. For example, Mr. Smith
became licensed as a private detective in 1977 and testified
that he had previously worked for Aetna Insurance Company
investigating complex claims, such as bond claims, fraud, and
arson for profit. He has also performed investigative work for
large Fortune 500 companies and law firms, including security
audits and assessments. He is licensed through the Connecticut
Department of Public Safety and holds a security agency license.
Moreover, Mr. Smith testified that he worked for the State of
Connecticut from 2001 to 2004, where JSI was the on-call
security consultant for all schools. When conducting these
assessments, JSI's consultants, including Ralph Difonzo and John
Dewey, would assist. Plaintiff presented no evidence to
contradict these statements. This evidence would provide a
reasonable juror with a basis to conclude that JSI's services

---

[11] Although Ms. Piao testified that she believed $150 per hour was "quite high"
and that Mr. Troy, the Bluevision investigator, only charged $400 for about
eight hours work, there is no evidence upon which a jury could conclude that
Mr. Troy's fees are "reasonable and customary" for the community, or that he
had comparable experience to Mr. Smith.

were "superior and sophisticated." Moreover, there is no
evidence upon which a reasonable juror could conclude that Mr.
Smith provided false information, or otherwise provided this
information for the purposes of misleading plaintiff.
Accordingly, the trial evidence would not provide a reasonable
juror with any basis to conclude that JSI's conduct in
describing its services was deceptive.

Plaintiff next argues that Mr. Smith induced her to believe
that JSI was a national investigative agency with clients
throughout the country, capable of handling the most complex
investigations. Again, the trial evidence would not support a
reasonable juror finding such a representation to be false. As
previously discussed, Mr. Smith testified that JSI worked for
Fortune 500 companies and additionally has worked out of state,
including for the San Diego Unified School District. There is no
conflicting evidence. To the extent plaintiff claims it is
"deceptive" for JSI to operate out of a spare bedroom,
"pretending as though it has tentacles far and wide," there is
no evidence of record that Mr. Smith ever represented to
plaintiff that it had national offices. Plaintiff further
testified that she did not notice that JSI's website did not
list a street address. As previously discussed, the trial
evidence does not reasonably support a finding that JSI is
unable to handle "complex investigations." Plaintiff has failed
to present any evidence to support this claim. Accordingly, the
trial evidence would not provide a reasonable juror with a basis

to conclude that JSI's description of its investigative scope and ability was deceptive.

### e. *Breach of Contract*

Finally, plaintiff alleged that JSI's breach of contract violated CUTPA. As to CUTPA claims arising from a breach of contract,

> A simple breach of contract does not offend traditional notions of fairness and, standing alone, does not offend public policy so as to invoke CUTPA. A CUTPA claim lies where the facts alleged support a claim for more than a mere breach of contract. Depending upon the nature of the assertions, however, the same facts that establish a breach of contract claim may be sufficient to establish a CUTPA violation. That generally is so when the aggravating factors present constitute more than a failure to deliver on a promise.

Greene v. Orsini, 50 Conn. Supp. 312, 315, 926 A.2d 708, 711 (Conn. Super. 2007) (citations omitted). In this case, a reasonable juror considering the alleged breach of contract would conclude that the alleged breach did not violate CUTPA. Here, plaintiff alleged that JSI breached the contract by failing to cease work and notify her when the retainer had been depleted. Not only did plaintiff fail to present any evidence of this alleged breach, but she also failed to present evidence of any "aggravating factors" that would constitute more than a failure to deliver on a promise. See id. at 710-11 (citation omitted) ("There is a split of authority in Superior Court decisions regarding what is necessary to establish a CUTPA claim for breach of contract, the majority of courts holding that a simple breach of contract, even if intentional, does not amount to a violation of CUTPA in the absence of substantial

aggravating circumstances."); see also Naples v. Keystone Bldg. and Dev. Corp., 295 Conn. 214, 228 (2010) (compiling cases for proposition that contractual breach does not rise to the level of a CUTPA violation absent proof of unethical, unscrupulous, willful or reckless conduct). For these reasons, a reasonable juror would have to conclude that JSI's alleged breach of contract claim did not implicate any of the aggravating factors necessary to establish a CUTPA claim.[12]

## V.   CONCLUSION

Accordingly, for the reasons articulated above, the Court granted defendants' motion for judgment as a matter of law on plaintiff's CUTPA claim. [Doc. #95].

This is not a Recommended Ruling.  The parties consented to proceed before a United States Magistrate Judge on April 23, 2013 [Doc. #44], with appeal to the Court of Appeals.  Fed. R. Civ. P. 73(b)-(c).

Pursuant to Fed. R. Civ. P. 58, the clerk of the court will enter a separate judgment consistent with the jury's October 3, 2014 verdict. [Doc. #98].


ENTERED at Bridgeport this 18th day of December 2014.


_____/s/_____
HOLLY B. FITZSIMMONS
UNITED STATES MAGISTRATE JUDGE


---

[12] That the jury declined to find any breach of contract by defendant JSI further supports the Court's pre-verdict ruling that the alleged breach of contract did not rise to a CUTPA violation.